

FILED

4:39 pm, 7/22/25

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JOHN T. DORRANCE III,<br><br>    Plaintiff,<br><br>  VS.<br><br>PAMELA JO BONDI, Attorney General, U.S. Department of Justice in her official capacity as well as her successors and assigns,<br><br>    Defendant. | Case No.  25-CV-40-SWS |

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This matter comes before the Court on Defendant United States of America through the United States Department of Justice's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF 12) and supporting memorandum (ECF 13). Plaintiff John T. Dorrance III filed a response in opposition (ECF 16), and the government replied (ECF 17). For the reasons explained below, the Court finds the motion must be granted.

### BACKGROUND

Plaintiff is currently a citizen of the Republic of Ireland and resides in the Commonwealth of the Bahamas. (ECF 1, ¶ 6). Plaintiff was born in Joplin, Missouri in 1944. (ECF 1, ¶8).  Since 1973 Plaintiff and his family have owned a 16,000-acre ranch (the Ipy Ranch) located near Devil's Tower, Wyoming. (ECF 1, ¶ 8). Plaintiff, his wife,

and his children resided there for twenty years. *Id*. For reasons unstated, in 1993, Plaintiff renounced his United States citizenship and became a citizen of the Republic of Ireland. (ECF 1, ¶ 9). Despite renouncing his United States citizenship, Plaintiff remains the beneficial owner of the Ipy Ranch and visits regularly. (ECF 1, ¶ 8). Plaintiff also visits his son, daughter-in-law, and two grandchildren, all of whom reside in Texas. (ECF 1, ¶ 11). When Plaintiff travels to the United States he does so pursuant to a B-1/B-2 nonimmigrant visa. (ECF 1, ¶ 11). Plaintiff is also invested in U.S. companies and makes charitable contributions to organizations in Wyoming. (ECF 1, ¶ 10). Plaintiff additionally has hunting licenses in Wyoming and Texas, but federal statute 18 U.S.C. § 922(g)(7) bans him from owning a firearm as a person who has renounced their citizenship.

Plaintiff alleges this ban in 18 U.S.C. §922(g)(7) is unconstitutional as applied to Plaintiff in violation of both the Second Amendment and the Due Process Clause of the Fifth Amendment. Plaintiff also raises a claim for relief under the Declaratory Judgment Act. The government moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), as the government primarily asserts Plaintiff knowingly forfeited his Second Amendment rights when he renounced his citizenship. The government has the better argument.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Burnett v. Mortg.*

*Elec. Registration Syts, Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A motion to dismiss for failure to state a claim should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). While a complaint "does not need detailed factual allegations," pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly,* 550 U.S. at 555.

## DISCUSSION

Plaintiff challenges the constitutionality of the federal firearms ban in 18 U.S.C. § 922(g) and the exception to the ban carved out in § 922(y)(2)(A). Applicable here, Sections 922(g)(5) and 922(g)(7) state:

It shall be unlawful for any person—
(5) who, being an alien—
   (A) is illegally or unlawfully in the United States; or
      (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa …;
      …
(7) who, having been a citizen of the United States, has renounced his citizenship;
   …

> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C § 922(g)(5), (7).

Section 922(y)(2)(A) then provides an exception to the firearm ban for certain aliens admitted to the United States under nonimmigrant visas. It states:

> Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is—
> (A) admitted to the United States for lawful hunting or sporting purpose or is in possession of a hunting license or permit lawfully issued in the United States.

18 U.S.C. § 922(y)(2)(A). The prohibition on firearm possession for individuals who have renounced United States Citizenship was enacted as part of the Gun Control Act of 1968. Pub. L. No. 90-351 (1968).

1. **Second Amendment**

The Second Amendment establishes "the right of the people to keep and bear Arms." U.S. Const. amend. II. The Supreme Court established the framework for how a court must assess a Second Amendment challenge in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8 (2022). It provides:

> "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 17. Thus, following *Bruen*, the Court must first ask whether the firearm ban for renouncers covers conduct that falls within the plain text of the Second Amendment. *Id.* If

the plain text does govern the conduct, the Court may only uphold the ban if the government can "identify an American tradition justifying" the regulation. *Id.* at 38-39.

    a. **Plain Text**

The government first argues that those who renounce their citizenship are not members of "the people" protected by the Second Amendment, and thus the ban as applied to renouncers is not covered by the plain text of the Second Amendment.

The Supreme Court has not yet explicitly addressed the meaning of "the people" in the Second Amendment. However, the Supreme Court suggested that "the people" is a term of art with the same meaning in the First, Second, and Fourth Amendments, which all refer to individual rather than collective rights. *See District of Columbia v. Heller*, 554 U.S. 570, 579-81 (2008); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). In *Verdugo-Urquidez*, the Supreme Court considered the right of aliens to the protections of the Fourth Amendment, and wrote:

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution ... it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, ... refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

494 U.S. at 265; *see Heller*, 554 U.S. at 580 ("'the people' ... unambiguously refers to all members of the political community"). And while these cases address whether noncitizens, rather than former citizens, are members of "the people," the Supreme Court has stated the relevant inquiry is the connection a person has with this country. Thus, this Court finds the same inquiry is applicable to former citizens as well.

Yet, the government contends that because the Supreme Court in *Heller* repeatedly referred to "Americans" and "citizens" when discussing the right to keep and bear arms, the Court intended to limit the Second Amendment right to citizens. However, this Court does not believe that such passing references were an explicit determination as to the scope of "the people." The Tenth Circuit similarly declined to read into *Heller* an unwritten holding that the Second Amendment does not apply to noncitizens and "hesitate[d] to infer from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens." *U.S. v. Huitron-Guizar*, 678 F.3d 1164, at 1168-69 (10th Cir. 2012). While the Tenth Circuit also declined to decide whether the Second Amendment covered noncitizens, the Court assumed that the Second Amendment "could very well include" noncitizens (including those undocumented). *Id.* at 1169. While an important, interesting, and intellectually stimulating discussion, in this case, the Court will similarly avoid the question.[1] The Court will assume, without finding, that the "the people" protected by the Second Amendment could include at least some noncitizens who previously renounced their United States citizenship, like Plaintiff. Nevertheless, even if Plaintiff is a member of "the people" protected by the Second Amendment, § 922(g)(7) is still constitutional as applied to those, like Plaintiff, who renounce their United States citizenship.

b. **Historical Tradition**

After consideration of the plain text of the Second Amendment, *Bruen* requires the Court to consider whether § 922(g)(7) is "consistent with this Nation's historical tradition of

---

[1] The Tenth Circuit in *Huitron-Guizar* declined to draw this conclusion because of the "apparent inconsistency in assuming the existence of a right before sustaining a law that acts as a blanket prohibition on it." 678 F.3d at 1169.

firearm regulation." 597 U.S. at 17. For the Court to uphold § 922(g)(7), the government must "identify a well-established and representative historical *analogue*, not a historical *twin*. *Id.* at 30. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* That history supports regulation.

The government asserts § 922(g)(7) is analogous to the country's historical tradition of disarming those who have not sworn an oath of allegiance to the United States. This Court agrees. The United States, during its founding, prohibited those unwilling to swear an oath of allegiance to the United States from possessing firearms. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 506-08 (2004). And this Court believes those Founding-era laws are representative analogues to §922(g)(7)'s firearm ban for those who have renounced their citizenship to the United States.

Before the founding of the United States, several colonies "prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047-48 (11th Cir. 2022) (quoting Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 116 (2011)). Unsurprisingly, during the American Revolution, the allegiance requirement for gun ownership continued. Those "who didn't support the Revolution were ordered to turn over their guns." *Id.* The colonial governments during the Revolution generally disarmed those who "refused a test of allegiance." Robert H. Churchill, *Gun Regulation, the Police Power,*

7

*and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 158 (2007).

Following independence, an individual's undivided allegiance remained a "precondition to the right to keep and bear arms." *Jimenez-Shilon*, 34 F.4th at 1048 (quoting *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2011) (Menashi, J., concurring)). "[T]he new state governments … framed their police power to disarm around a test of allegiance." Churchill, 25 L. & Hist. Rev. at 159. And after the passage of the Declaration of Independence, Pennsylvania, Maryland, North Carolina, and Virgina all instituted test oaths and barred those who refused from basic liberties, including keeping arms. *Id.* at 159-60; *see United States v. Gil-Solano*, 699 F.Supp.3d 1063, 1070-71 (D. Nev. 2023). These historical laws banning firearms ownership for those who refused to swear allegiance are analogous to § 922(g)(7)'s prohibition directed at those who renounce United States citizenship. Both sought to prohibit firearms from those "who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society" due to questionable allegiance. *U.S. v. Casterline*, 103 F.3d 76, 79 (9th Cir. 1996) (quoting *Scarborough v. United States*, 431 U.S. 563, 572 (1977); *see also United States v. Vazquez-Ramirez,* 711 F.Supp.3d 1249, 1259 (E.D. Wash. 2024) (agreeing that historical regulations "barred persons deemed disloyal or of questionable allegiance from possessing firearms").

Yet, Plaintiff contends "there is no historical evidence from the founding era that noncitizens lawfully present in this country were categorically disarmed as Section 922(g)(7)." However, Plaintiff improperly frames the ban in § 922(g)(7). Section 922(g)(7) does not ban firearms from "noncitizens lawfully present in this country;" it more

8

specifically restricts firearms access for those "who, having been a citizen of the United States, has renounced his citizenship." To renounce your citizenship and become a citizen of a foreign country, as Plaintiff did, includes not only a declaration of allegiance to a country other than the United States but also a repudiation of allegiance to the United States. The Court has already established that a historical tradition for withholding firearms from those who refuse to swear allegiance to the United States exists. That tradition is certainly analogous, if not more applicable to and supportive of, § 922(g)(7)'s treatment of those who not only refuse to swear allegiance but intentionally repudiate their allegiance to the United States.

Plaintiff argues the historical tradition of "loyalty oath-based prohibitions on firearms possessions" found analogous to § 922(g)(5) in *Gil-Solano* is not applicable to Plaintiff because he is lawfully present in the country. Plaintiff refers to the court's conclusion that "[the] historical record [of loyalty oath-based prohibitions] mirrors current federal gun laws: non-citizens are not categorically denied the right to bear arms—and may even have an affirmative Second Amendment right—unless they are unlawfully present and thus have not formally sworn allegiance to the United States." *Gil-Solano*, 699 F.Supp.3d at 1071. However, that statement and *Gil-Solano's* ultimate conclusion addressed the prohibition in § 922(g)(5) for aliens "unlawfully in the United States," hence the focus on lawful presence. A focus inapplicable to the analysis in § 922(g)(7) for those who have renounced their United States citizenship.

This Court is not relying on *Gil-Solano*'s ultimate conclusion as to § 922(g)(5) but rather draws the same conclusion as to the finding of a historical tradition of oath-based

prohibitions. A historical tradition which is even more directly analogous to the prohibition on firearm possession for those who have renounced their United States citizenship in § 922(g)(7).

Further, the Court does not find that any informal "local and temporary allegiance" Plaintiff may owe or has fulfilled while present in the United States outweighs Plaintiff's previous formal relinquishment of his United States citizenship and allegiance. The United States' historical tradition of oath-based prohibitions addressed those who were present in the United States but still refused to formally swear an oath of allegiance. *See* Churchill, 25 L. & Hist. Rev. at 159. And while the Court may see some validity in the contention that citizenship status alone is not determinative of allegiance, a person who formally renounces their citizenship to the United States has taken affirmative steps to disavow their allegiance. A firearm prohibition for those who take such affirmative action, even if that person frequently visits the United States lawfully, has comparable justifications and comparable burdens to early American laws requiring loyalty oaths for firearm possession. *See Bruen*, 597 U.S. at 29.

Accordingly, the Court finds § 922(g)(7) is "consistent with this Nation's historical tradition of firearm regulation," and is constitutional under the Second Amendment as applied to Plaintiff. *Bruen*, 597 U.S. at 17.

### 2. Fifth Amendment Due Process Clause

Plaintiff additionally asserts that the exception provided for aliens admitted to the United States under a nonimmigrant visa for lawful hunting or sporting purposes in § 922(y)(2)(A), but not applicable to those who renounce citizenship, denies him equal

protection in violation of the Fifth Amendment. The exception at issue provides that subsection (g)(5)(B) does "not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is—admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States." § 922(y)(2)(A). Section 922(y)(2)(A) would apply to Plaintiff as an alien admitted under a nonimmigrant visa for lawful hunting purposes if it weren't for § 922(g)(7). Section 922(g)(7) prohibits firearms for those who renounced their United States citizenship, and the statutory exception in § 922(y)(2)(A) does not apply to those renouncers. Plaintiff claims, because the exception applies to other aliens who also travel to the United States on nonimmigrant visas for hunting purposes but not to him because he renounced his citizenship, the exception violates the Due Process Clause of the Fifth Amendment.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property without due process of law[.]" U.S. Const. amend. V. The Supreme Court has held that this Clause "contains within it the prohibition against denying to any person the equal protection of the laws" identical to what the Fourteenth Amendment guarantees in state laws. *U.S. v. Windsor*, 570 U.S. 744, 774 (2013); *see Sessions v. Morales-Santana,* 582 U.S. 47, 51 n.1 (2017). "[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998); *see Gil-Solano*, 699 F.Supp.3d at 1072-73. Plaintiff fails to make this threshold showing and his equal protection claim therefore fails.

While no case precisely on point exists to determine whether noncitizens who previously renounced their citizenship are similarly situated to other noncitizens, the Tenth Circuit has made determinations as to key distinctions that render certain noncitizens not similarly situated to citizens or other noncitizens. The Tenth Circuit has held that noncitizens are not similarly situated to citizens and has also implicitly stated that lawful and unlawful noncitizens are additionally not similarly situated. *Huitron-Guizar*, 678 F.3d at 1167 ("aliens, let alone those unlawfully here, are simply not situated like citizens[,]" and "[t]he line separating lawful and unlawful aliens is often as bright as that between aliens and citizens."). Thus, the Tenth Circuit holds that citizenship status and unlawful presence are distinctions which render two persons not similarly situated. *See id.* This Court finds that renunciation of previous citizenship is also a valid and key distinction that renders two noncitizens not similarly situated.

"People are 'similarly situated' when their circumstances are practically 'indistinguishable,' *Ross v. Moffitt*, 417 U.S. 600, 609 (1974), or 'in all relevant aspects alike,' *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)." *Gil-Solano*, 699 F.Supp.3d at 1073. While they need not be similar in all aspects to be similarly situated, "they must be similar in those respects that are relevant to [the United States'] own interests and its policy." *Id.* (quoting *Ariz. Dream Act. Coal. V. Brewer,* 855 F>3d 957, 966 (9th Cir. 2017). Here, in a very relevant aspect, Plaintiff, as a person who is now a noncitizen because he renounced his citizenship, is dissimilar from other noncitizens who have never been United States citizens. Plaintiff voluntarily took affirmative action to relinquish the United States citizenship he once possessed. This choice, no matter why it was made, is relevant to the

United States' interests and policies as to who should possess firearms. So much so that renouncers are prohibited from possessing firearms by a distinct subsection of the statute from other noncitizens. *See* 18 U.S.C. § 922(g)(7); (g)(5). Plaintiff's request that the Court finds him similarly situated to the other noncitizens who receive the exception asks us to ignore that key distinction. Plaintiff's circumstances as a person who became a noncitizen by volitionally renouncing his United States citizenship are not "indistinguishable" from other noncitizens who were never United States citizens in the first place. Plaintiff is not similarly situated to other noncitizens who receive the exception under § 922(y)(2)(A). Plaintiff's equal protection claim fails for this reason alone.

## CONCLUSION AND ORDER

Plaintiff's claim for relief under the Second Amendment fails as the firearm prohibition applicable to him as a renouncer in § 922(g)(7) is consistent with this Nation's historical tradition of prohibiting firearms from those that do not swear allegiance to the United States. Further, Plaintiff's claim for relief under the Fifth Amendment fails. Plaintiff, as a noncitizen by renunciation, is not similarly situated to other noncitizens who received the statutory exception and were never citizens of the United States. As Plaintiff fails to state a claim upon which relief can be granted under either the Second or the Fifth Amendments, Plaintiff's action must be dismissed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (ECF 12) is **GRANTED and the Clerk of Court will please enter a judgment terminating this case.**

Dated this 22nd day of July, 2025.

Scott W. Skavdahl
United States District Judge